**Slip Op. 21-53**

## UNITED STATES
## COURT OF INTERNATIONAL TRADE

─────────────

**Court No. 20-00075**

─────────────

COMMUNICATIONS WORKERS OF AMERICA
LOCAL 4123, on behalf of FORMER EMPLOYEES
OF AT&T SERVICES, INC.,

*Plaintiff,*

v.

U.S. SECRETARY OF LABOR,

*Defendant.*

─────────────

Before: M. Miller Baker, Judge

## OPINION

[Plaintiffs' motion for judgment on the agency record is granted and this matter is remanded to the Department of Labor for further consideration.]

Dated: May 4, 2021

*Devin S. Sikes*, Akin Gump Strauss Hauer & Feld LLP of Washington, DC, argued for Plaintiffs. With him on the brief were *Bernd G. Janzen* and *Tebsy Paul*.

*Ashley Akers*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, argued for Defendant. With her on the brief were *Jeffrey Bossert Clark*, Acting Assistant Attorney General; *Jeanne E. Davidson*, Director; and

*Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Tecla A. Murphy*, Attorney Advisor, Employment and Training Legal Services, Office of the Solicitor, U.S. Department of Labor of Washington, DC.

*Baker*, Judge: Several decades ago, Congress established a remedial program to provide benefits to American workers displaced by the offshoring of manufacturing or service jobs. *See Former Emps. of BMC Software, Inc. v. U.S. Sec'y of Labor*, 454 F. Supp. 2d 1306, 1307 (CIT 2006) ("Trade adjustment assistance . . . programs historically have been—and today continue to be—touted as the *quid pro quo* for U.S. national policies of free trade."). In this case, a union challenges the Labor Department's denial of benefits to former AT&T call center employees under that program. The Court agrees with the union that Labor's summary denial of benefits is not supported by substantial evidence, and remands for further proceedings consistent with this opinion.

## Statutory and Regulatory Background

In the Trade Act of 1974, Congress updated a preexisting mechanism for providing benefits—referred to as "trade adjustment assistance"—to Americans who lose their jobs, or whose work hours and pay are reduced, due to foreign trade. *See* 19 U.S.C. § 2271 *et seq.*; *see also* U.S. Dep't of Labor, *Getting Back to Work After a Trade Related Layoff*, at 2, https://www.dol.gov/sites/dolgov/files/ETA/tradeact/pdfs/program_brochure2014.pdf (accessed May 3, 2021).

Under that statute, a group of workers in the same firm, their union, or their authorized representative may petition the Department of Labor to certify them as eligible to apply for trade adjustment assistance benefits and services. *See* 19 U.S.C. § 2271(a)(1); *see also Getting Back to Work*, *above*. Once Labor receives a petition, it investigates whether the circumstances of the workers' layoff satisfy certain statutory criteria. *See Getting Back to Work*, *above*.

As relevant here, those criteria are as follows:

**(a) In general**

A group of workers shall be certified by the Secretary as eligible to apply for adjustment assistance under this part . . . if the Secretary determines that—

**(1)** a significant number or proportion of the workers in such workers' firm have become totally or partially separated, or are threatened to become totally or partially separated; and

**(2) … (B)**

  **(i)**

      **(I)** there has been a shift by such workers' firm to a foreign country in the production of articles or the supply of services like or directly competitive with articles which are produced or services which are supplied by such firm; or

**(II)** such workers' firm has acquired from a foreign country articles or services that are like or directly competitive with articles which are produced or services which are supplied by such firm; and

**(ii)** the shift described in clause (i)(I) or the acquisition of articles or services described in clause (i)(II) contributed importantly to such workers' separation or threat of separation.

19 U.S.C. § 2272(a).

Thus, as relevant here, for a group of workers to receive certification of eligibility for trade adjustment assistance, they must satisfy §§ 2272(a)(1) (show that they were separated), (a)(2)(B)(i) (show that the services they formerly provided are now provided abroad), *and* (a)(2)(B)(ii) (show that the foreign provision of such services "contributed importantly" to their separation). The dispute here involves Labor's determination regarding the second of these requirements.

In determining whether to certify a group of workers as eligible under these criteria, Labor must "obtain from the workers' firm . . . information the Secretary determines to be necessary to make the certification, through questionnaires and in such other manner as the Secretary determines appropriate." 19 U.S.C. § 2272(d)(1). The statute directs the Secretary to require a firm to "certify" all information submitted in response to questionnaires. *Id.* § 2272(d)(3)(A)(i). The Secretary must also require certification of all other information obtained from a firm or a customer "on

which the Secretary relies in making a[n eligibility] determination . . . , unless the Secretary has a reasonable basis for determining that such information is accurate and complete without being certified." *Id.* § 2272(d)(3)(A)(ii).[1]

Labor's regulations require the Department to issue either a certification of eligibility or a notice of negative determination specifying the reasons for the negative decision, and in either case to publish in the Federal Register a summary of the determination and the reasons for making it. 29 C.F.R. § 90.16(c), (f). If Labor returns an affirmative determination, the Department also issues a "certification of eligibility" allowing the workers to apply individually for benefits and services. *Id.* § 90.16(c); *see also Getting Back to Work*, *above* ("Workers in a certified group . . . may apply for individual eligibility for benefits and services."). If Labor returns a negative determination, the workers may

---

[1] The statute grants the Secretary broad authority to seek "additional information" by contacting, *inter alia*, officials or employees of the workers' firm (apparently in their individual capacity rather than as representatives of the firm), officials of the workers' firm's customers, or union officials or other "duly authorized representatives of the group of workers." *Id.* § 2272(d)(2)(A)(i)–(iii). The Secretary may also "us[e] other available sources of information." *Id.* § 2272(d)(2)(B). Unlike information obtained directly from the workers' firm, Labor need not require certification of such additional information or find a reasonable basis for relying upon such noncertified information.

ask the Department to reconsider. *See generally* 29 C.F.R. § 90.18.[2]

Following a final negative determination, a worker, a group of workers, a certified or recognized union, or the group's authorized representative may commence a civil action in this Court for review of the determination. *See* 19 U.S.C. § 2395(a).

## Factual and Procedural Background

### A. The union's petition for benefits

In March 2019, Communications Workers of America Local 4123 filed a petition for trade adjustment benefits on behalf of AT&T "Consumers Group" employees at the Kalamazoo (Michigan) Lovell Call Center. AR3. The petition alleged that AT&T established call centers in multiple foreign locations, including Mexico, the Philippines, and the Caribbean, and that during 2019 AT&T planned to close the Kalamazoo call center and four other call centers operated by the company. AR3–4.[3] Thereafter, Labor agreed to deem the petition as also encompassing the four other call

---

[2] Reconsideration may be granted in three circumstances: "(1) If it appears on the basis of facts not previously considered that the determination complained of was erroneous; (2) If it appears that the determination complained of was based on mistake in the determination of facts previously considered; or (3) If, in the opinion of the certifying officer, a misinterpretation of facts or of the law justifies reconsideration of the determination." 29 C.F.R. § 90.18(c).

[3] Citations to "AR" refer to the public version of the administrative record, ECF 15.

centers (in Appleton, Wisconsin; Indianapolis, Indi-
ana; Syracuse, New York; and Meriden, Connecticut).
AR14–15.

In support of its petition, the union submitted its
own "AT&T Jobs Report" asserting that the company
closed multiple call centers and laid off several thou-
sand workers while shifting work to lower-wage con-
tract workers, many of them located abroad. AR20.
The report identified the Indianapolis, Kalamazoo,
and Appleton call centers as locations facing imminent
closure. AR20. The union further contended that
AT&T opened a call center in Mexico and planned to
expand it by moving jobs away from U.S.-based loca-
tions. AR22.

## B. Labor's initial investigation and report

Following receipt of the petition, Labor contacted
AT&T officials and asked that they complete question-
naires relating to the five call centers identified by the
union. AR26–35, AR38–42, AR43–45.[4]

---

[4] The questionnaires requested certifications under pen-
alty of law for false statements and warned:

> Knowingly falsifying any information on this form is a
> Federal offense (18 U.S.C. § 1001) and a violation of the
> Trade Act (19 U.S.C. § 2316). By signing below, you
> agree to the following statement: "Under penalty of
> law, I declare that to the best of my knowledge and be-
> lief the information I have provided on this form is true,
> correct, and complete."

AR57 (Appleton), AR67 (Indianapolis), AR76 (Kalamazoo),
AR98 (Meriden), and AR112 (Syracuse).

**Court No. 20-00075**                                    **Page 8**

Among other things, the questionnaire responses specifically addressed the reasons for the call center closures and the potential loss of jobs. AT&T stated that three of the call centers closed because they were being consolidated into other domestic call centers. AR53 (Appleton), AR63 (Indianapolis), AR73 (Kalamazoo). AT&T stated that the other two call centers closed because their operations were being moved to other domestic locations. AR92 (Meriden), AR106 (Syracuse). For all five call centers, AT&T emphasized that displaced employees were offered the opportunity to move to the new call center locations or to train for alternative positions and further emphasized that all work was remaining in the United States. AR53, AR63, AR73, AR92, AR106.

Following AT&T's submission of the questionnaire responses, Labor's investigator e-mailed AT&T's in-house counsel a series of informal follow-up questions. The transmittal e-mail stated that the union had identified (1) an individual who worked in Jamaica but reported to a manager in the Appleton call center and (2) an individual who worked in the Philippines but reported to a manager in Brecksville, Ohio, "which is another location that has laid off hundreds of Union workers." AR114 (quoting the union's allegations). Based on that information and on AT&T's questionnaire responses, Labor asked AT&T whether the allegations that foreign workers were supervised by U.S. managers were true; if so, AT&T was to answer a series of further questions. AR114.

AT&T's in-house counsel responded—in the same informal e-mail format as Labor's inquiries—that the

allegations were not true and that the foreign workers were employed by vendors, supervised by vendor managers, and handled calls that were never serviced by employees in the Kalamazoo, Appleton, or Indianapolis call centers. AR122; *see also* AR126 (response for Syracuse and Meriden that referred to the response for the other three centers).

Following the receipt of AT&T's e-mail responses to the investigator's inquiries, someone at Labor—presumably the investigator—prepared an unsigned "investigative report" that determined that the loss of jobs at the five call center locations was not attributable to the company's offshoring of the work. AR141 *et seq*. The report summarized the factual record discussed above and stated that AT&T "reported that they have not shifted the supply of services like or directly competitive to those of the workers to a foreign country nor acquired any services like or directly competitive to those of the workers from a foreign country." AR149. The report also quoted AT&T's statement about the two workers in Jamaica and the Philippines and did not address the point further. AR150.

### C. Labor's initial negative determination

Following the investigative report, Labor issued a "Negative Determination Regarding Eligibility to Apply for Worker Adjustment Assistance"—essentially, an administrative opinion. AR154 *et seq*. As to the relevant statutory tests, Labor found that AT&T

did not shift the supply of call center, billing, or network operations services or like or directly

competitive services to a foreign country or acquire call center, billing, or network operations services or like or directly competitive services from a foreign country. AT&T officials have confirmed the work remained in the United States.

AR160. Accordingly, the certifying officer concluded that "the requirements of Section 222 of the Act, 19 U.S.C. § 2272, have not been met and, therefore, den[ied] the petition for group eligibility . . . ." AR160–61.

### D. The union's request for reconsideration

After Labor issued its negative determination, the union submitted a one-page letter "requesting an appeal to the determination made to deny the original petition," AR173, which Labor construed as an application for reconsideration under 29 C.F.R. § 90.18. The letter gave two reasons for the request: (1) "The majority of the workers at that location were separated from the company" and (2) "The work that was being done has shifted to offshore locations as documented in the evidence presented with the original petition." AR174. The letter contained no attachments with new evidence.

Labor—through a new certifying officer not previously involved in the matter—granted the reconsideration request with boilerplate language stating that "[t]he request for reconsideration includes new information and allegations regarding a shift in services to

a foreign country"[5] such that "the claim is of sufficient weight to justify reconsideration of the U.S. Department of Labor's prior decision." AR177–78.

### E. Labor's reconsideration investigation and report

After granting reconsideration, a new investigator at Labor and AT&T's in-house counsel exchanged e-mails probing deeper into the issues raised by the union's petition. Following these exchanges, Labor issued an unsigned "Reconsideration Investigative Report"—presumably authored by the new investigator—affirming the initial negative determination's conclusion that there was "no shift in services/no company or customer imports." AR362–63 (cleaned up). The reconsideration report found that AT&T "confirmed" that the Kalamazoo, Appleton, and Indianapolis locations "did not shift services like or directly competitive with the services supplied by the workers of the subject firm to foreign country [sic] or contract to have services like or directly competitive with those supplied by the workers of the subject firm in a foreign country." AR373–74.

---

[5] The record contained no basis for this statement given that the union's reconsideration letter referred to "the evidence presented with the original petition" rather than any new information. AR174. At oral argument, the government's counsel explained that Labor routinely grants reconsideration notwithstanding the Department's nominally stringent standard governing such requests. *See above* note 2.

**Court No. 20-00075**                                    **Page 12**

As to the other two locations (Syracuse and Meriden), Labor repeated the same findings set forth above—AT&T confirmed the company did not shift services abroad or contract to have services supplied abroad, AR378—and quoted AT&T's assertion that the union focused on the call centers' closures rather than the reasons for such closures. AR379.

## F. Labor's decision on reconsideration

Following the reconsideration investigative report, Labor—through the same certifying officer who granted reconsideration—issued a "Notice of Negative Determination on Reconsideration." This document echoed the prior boilerplate finding that the union's "request for reconsideration included new information and allegations regarding a shift in services to a foreign country." AR385. The document's substantive discussion was also boilerplate:

> Information obtained during the reconsideration investigation confirmed that the workers' firm neither shifted the supply of call center support services, billing support services, or network operations center support services (or like or directly competitive services) to a foreign country nor contracted to have such services supplied by a foreign country.

> After careful review of previously-submitted information and additional information obtained during the reconsideration investigation, the Department determines that 29 CFR 90.18(c) [governing reconsideration] has not been met.

AR386. The determination then concluded that the requirements of 19 U.S.C. § 2272 had not been met; therefore, the original determination, which found the union's members ineligible to apply for trade adjustment assistance, was affirmed. AR386.

## G. This litigation

After Labor issued its negative reconsideration determination, Communications Workers of America Local 4123 sent a letter to the clerk "to request a judicial appeal to [Labor's] negative determination" of the union's petition. ECF 1, at 1. The clerk deemed this *pro se* letter as the union's complaint and summons. *See* ECF 4.

The union—now represented by counsel[6]—moves for judgment on the agency record and asks the Court "to hold that neither substantial evidence nor the law supports Labor's negative determinations" and "to vacate Labor's negative determinations and remand this matter to Labor so that the agency may take further evidence pursuant to 19 U.S.C. § 2395(b) and issue a determination consistent with the Court's order and

---

[6] At the invitation of the clerk, attorneys at the law firm of Akin Gump Strauss Hauer & Feld entered their pro bono appearances as counsel for the union. *See* ECF 10, 11, 19. Counsel for the union have ably discharged their assignment. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 543 n.2 (2012).

opinion in this matter." ECF 23, at 1–2;[7] *see* USCIT R. 56.1. The government opposes. ECF 24.

## Jurisdiction and Standard of Review

The union brings this action under 19 U.S.C. § 2395(a). In addition to conferring a cause of action, § 2395(a) in effect codifies the associational standing of unions to represent their members aggrieved by Labor's denial of benefits.[8] *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281–82 (1986) (explaining associational standing of organization to represent its members).

The Court has jurisdiction over § 2395(a) claims pursuant to 28 U.S.C. § 1581(d)(1), which grants this Court exclusive jurisdiction over any civil action commenced to review "any final determination of the Secretary of Labor under section 223 of the Trade Act of 1974 with respect to the eligibility of workers for

---

[7] In this opinion, citations to the parties' briefing use the CM/ECF docket entry (ECF 23 for the union's opening brief, ECF 24 for the government's brief, and ECF 25 for the union's reply).

[8] Here, the administrative record includes evidence—not merely allegations—establishing that the union's members were employed at the five relevant call centers and thus were injured by Labor's denial of eligibility. *See* AR3–4; *cf. Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir. 2002) ("In many if not most cases the petitioner's standing to seek review of administrative action is self-evident; no evidence outside the administrative record is necessary for the court to be sure of it.").

adjustment assistance under such Act." *See also* 19 U.S.C. § 2395(c) (same).

The standard of review for factual issues is prescribed by 19 U.S.C. § 2395(b), which provides that "[t]he findings of fact by the Secretary of Labor, . . . if supported by substantial evidence, shall be conclusive; but the court, for good cause shown, may remand the case to such Secretary to take further evidence, and such Secretary may thereupon make new or modified findings of fact and may modify his previous action, and shall certify to the court the record of the further proceedings."

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. A reviewing court must consider the record as a whole, including that which fairly detracts from its weight, to determine whether there exists such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (cleaned up).

Beyond the substantial evidence standard of review applicable to factual issues, Labor's decision is also subject to the default standard of the Administrative Procedure Act, which allows a reviewing court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Former Emps. of Motorola Ceramic Prods. v. United States*, 336 F.3d 1360, 1362 (Fed. Cir. 2003) (stating, in trade adjustment case, that "[t]he Court of International Trade

also has the authority under the Administrative Procedure Act to set aside the decision as contrary to law or arbitrary and capricious");[9] *see also United States Capitol Police v. Off. of Compliance*, 908 F.3d 748, 756 (Fed. Cir. 2018) ("A reviewing court must apply the APA's . . . review standards in the absence of an exception.") (cleaned up and quoting *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999)).

## Discussion

This case presents two issues. First, is Labor's negative determination[10] on its own terms supported by substantial evidence and otherwise consistent with

---

[9] At oral argument, the government disputed the APA's applicability to this case. This argument is foreclosed by *Motorola*.

[10] The parties' briefing did not address what happens if the Court concludes that only one of the two determinations before it—the initial negative determination or the later reconsideration determination—passes muster. At argument, the union took the position that a remand is required if either decision is not supported by substantial evidence or is contrary to law; the government argued that so long as one of the determinations is supported by substantial evidence and is otherwise consistent with law, the Court can sustain Labor. The Court agrees with the government; in this situation, Labor's two determinations amount to alternative grounds, and the Court can sustain either one as the Department's decision. *Cf. Packers Plus Energy Servs. Inc. v. Baker Hughes Oilfield Operations, LLC*, 773 F. App'x 1083, 1088 (Fed. Cir. 2019) (court can sustain administrative decision on alternative grounds where the parties had the opportunity to address each ground and the agency considered each of the facts underlying the alternative grounds).

**Court No. 20-00075** **Page 17**

law? Second, did Labor act arbitrarily by treating the union's petition in this case differently than it treated allegedly similarly situated petitioners in other cases involving other AT&T call centers? The Court addresses each issue in turn.

## I.

As the union's reply brief explains, the critical question here—in view that there is no dispute that the union's members were separated from their call center jobs, *see* 19 U.S.C. § 2272(a)(1)—is whether Labor properly concluded for purposes of 19 U.S.C. § 2272(a)(2)(B)(i) that AT&T "had not (1) shifted the supply of call center support services, billing support services, or network operations center support services to a foreign country, or (2) contracted to have such services supplied by a foreign country." ECF 25, at 2.

## A.

As noted above, the analysis in Labor's initial negative determination consisted of two sentences:

> [T]he investigation revealed that the firm did not shift the supply of call center, billing, or network operations services or like or directly competitive services to a foreign country or acquire call center, billing, or network operations services or like or directly competitive services from a foreign country. AT&T officials have confirmed the work remained in the United States.

AR160 (emphasis added).

### 1.

The union's first two lines of attack are that Labor failed to "identify the particular record evidence on which it relied for its finding or explain why it reached the conclusion that it did in view of the record as a whole." ECF 23, at 13. Relatedly, the union asserts that Labor did not discuss the record evidence "that cuts against its finding and how, nevertheless, the substantiality of the record points to its proffered finding." *Id*.

As to the first point, although it is true that the Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974), the problem here is that the certifying officer did not identify AT&T's evidence that she found persuasive—as noted above, she merely stated that "AT&T officials have confirmed the work remained in the United States." AR160. While the Court can reasonably discern that she found AT&T's evidence convincing, that fact alone is not enough because portions of AT&T's evidence (its questionnaire responses) were certified pursuant to 19 U.S.C. § 2272(d)(3)(A)(i) while other portions (the e-mail exchanges between AT&T's in-house counsel and Labor's investigator) were not. The Court explains the significance of that distinction in Part I.A.3., *below*, but the upshot is that the Court is unable to determine whether, or to what extent, the certifying officer relied upon AT&T's noncertified evidence. The Court must remand so that Labor can do so unless the

Department's reconsideration determination inde-
pendently supports its denial of benefits.

The union's second line of attack also lands on tar-
get. Labor's negative determination simply did not
acknowledge, much less discuss, the union's evidence,
which as discussed above consisted of a job report and
certain anecdotal examples of offshoring of work. *See*
AR17–25 (job report), AR129–30 (anecdotal evi-
dence).[11] Nor did that determination explain—directly
or indirectly—why the certifying officer chose AT&T's
explanation over the union's evidence. "[T]he agency
must examine the relevant data and articulate a sat-
isfactory explanation for its action including a rational
connection between the facts found and the choice
made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.
Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up) (cit-
ing *Burlington Truck Lines, Inc. v. United States*, 371
U.S. 156, 168 (1962)). That means it's the agency's job
to weigh the evidence—not to ignore the evidence on
one side of the scale and leave it to the court to surmise
why the agency made the decision it did.

---

[11] The government argues that the investigative report's
reference to the job report obviates the absence of any such
reference in the initial negative determination. ECF 24, at
16–17. The problem with this argument is twofold. First,
insofar as the investigator addressed the job report, the
Court is unable to reasonably discern the certifying officer's
view of it—the negative determination does not even make
an oblique reference to the job report. Second, the investi-
gative report itself did not address the job report, except in
a passing reference that simply quoted the petition's refer-
ence to it. *See* AR145.

**Court No. 20-00075**                    **Page 20**

The government offers two responses. First, as to the job report, it argues that no such discussion was necessary because nothing in the report "mentions any connection between the work of the foreign call centers and any of the five AT&T call centers in question. It is not readily obvious why or how the information in the job report could reasonably be interpreted to 'cut against' Labor's determination." ECF 24, at 16.

Although the government is certainly correct that the job report does not directly contradict the certifying officer's conclusion—as the union's counsel conceded at argument, the job report contains no "smoking gun"—"the substantiality of evidence must take into account whatever in the record fairly detracts from its weight, including contradictory evidence *or evidence from which conflicting inferences could be drawn.*" *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380–81 (Fed. Cir. 2008) (cleaned up and emphasis added). Here, a fair reading of the job report permits the drawing of inferences that conflict with the certifying officer's conclusion.

Specifically, the report stated that AT&T has closed multiple call centers and laid off several thousand workers while shifting work to lower-wage contract workers, many of them located abroad. AR20. The report mentioned the Indianapolis, Kalamazoo, and Appleton call centers as locations facing imminent closure, and asserted that "the company can decide where to route calls and continues to contract with global third-party call centers to handle collections cases." AR21. The report quoted a longtime employee in Appleton who contended that AT&T was moving jobs to

offshore locations with lower-wage workers. AR21–22.
The union further contended that AT&T opened a call
center in Mexico and planned to expand it by moving
jobs away from U.S.-based locations. AR22. All of this,
fairly read, at least allows for an inference that the clo-
sures of the call centers in question will result in the
offshoring of job functions previously performed in
those facilities.[12]

Although an agency adjudicator, such as the certi-
fying officer at Labor, need not address every piece of
evidence in the record, *see, e.g.*, *Novartis AG v. Torrent
Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017) (ex-
plaining that it was not necessary for agency to "ex-
pressly discuss each and every negative and positive
piece of evidence lurking in the record . . . ," and noting
that agency's citation of relevant record pages estab-
lished that it had considered them even though it did
not discuss them in its written decision), the failure to
do so risks a remand if such evidence is susceptible of
a fair inference that detracts from the agency's conclu-
sion. Because the certifying officer failed to discuss or
even indirectly reference the union's evidence from
which reasonable conflicting inferences can be drawn,
the Court must remand unless Labor's reconsideration

---

[12] The government does not respond to the union's argu-
ment that Labor's certifying officer also overlooked the un-
ion's anecdotal evidence. In any event, that evidence is also
susceptible of the fair inference that the jobs in question
were offshored. *See* AR129–30 ("We have two examples be-
low of calls made regarding products our Reps do support
for that have been routed to overseas vendors.").

determination independently supports the Department's denial of benefits.

**2.**

The union's third line of attack on the initial negative determination is that Labor's investigator did not take "additional investigative steps" that the union contends were required under *Former Employees of Marathon Ashland Pipe Line LLC v. Chao*, 370 F.3d 1375 (Fed. Cir. 2004), due to the presence of conflicting evidence. *See* ECF 23, at 16–17. In that decision, which apparently involved noncertified employer statements, the Federal Circuit stated that Labor could rely on such representations "if the Secretary reasonably concludes that those statements are creditworthy and are not contradicted by other evidence." *Marathon*, 370 F.3d at 1385 (citing *Former Emps. of Barry Callebaut v. Chao*, 357 F.3d 1377, 1383 (Fed. Cir. 2004)).[13] A "conflict over the underlying facts in the evidence" would require that the "Secretary take further investigative steps before making her certification decision." *Id.*

---

[13] The Federal Circuit's statement that Labor could rely on noncertified employer representations "if the Secretary reasonably concludes that those statements are creditworthy" appears to be an allusion to 19 U.S.C. § 2272(d)(3)(A)(ii), which requires that "the Secretary ha[ve] a reasonable basis for determining that such information is accurate and complete without being certified." *Id.*

Even if it represents a correct statement of the law,[14] *Marathon* does not apply here. To begin with, AT&T's questionnaire responses were certified under penalty of law and were thus presumptively creditworthy under the statute. *See* 19 U.S.C. § 2272(d)(3)(A)(i). Moreover, Labor *did* undertake additional investigative steps here. The initial investigative report reveals that Labor's investigator had several exchanges with AT&T's in-house counsel *after* receiving the company's questionnaire responses. *See* AR113–28; AR135–40. Then, Labor granted reconsideration, and a new investigator had several more exchanges with AT&T's in-

---

[14] The Court doubts the correctness of *Marathon*'s suggestion that Labor may not rely on noncertified but reasonably creditworthy representations of company officials when such representations are contradicted by other evidence. That proposition—which is dicta—is untethered to the statute, which charges the Department—not the courts—with "establish[ing] standards . . . for investigations of petitions . . . and criteria for making determinations." 19 U.S.C. § 2273(e)(1). Nor is it tethered to *Barry Callebaut*, which *Marathon* cites.

In the Court's view, the only question for the courts in trade adjustment assistance cases is whether Labor's determinations are supported by substantial evidence and otherwise consistent with the APA. Under those standards, Labor *can* rely on noncertified representations from an employer—*if*, as explained below, it finds them reasonably creditworthy and explains its reasons for doing so—so long as it addresses the conflicting evidence (or evidence giving rise to conflicting inferences) and adequately explains its reasons for choosing the employer's noncertified but reasonably creditworthy evidence over conflicting evidence or inferences.

house counsel. *See* AR188–220; AR222–61; AR295–312; AR325–61.

Insofar as *Marathon* requires additional investigative steps, Labor took them here. The problem with Labor's initial negative determination is not with the Department's investigation, but rather with the certifying officer's failure to sufficiently explicate her reasons based on the results of that investigation.

## 3.

Finally, the union challenges the investigator's—and by extension, the certifying officer's—reliance on "uncorroborated statements from AT&T officials whose accuracy Labor never confirmed." ECF 23, at 17. Specifically, the union complains—citing *Former Employees of Tyco Toys, Inc. v. Brock,* 12 CIT 781 (1988), and *Former Employees of BMC Software, Inc. v. U.S. Secretary of Labor*, 454 F. Supp. 2d 1306 (CIT 2007)—that "Labor failed to establish that the officials certifying each response had personal knowledge over what transpired at each location" and "likewise failed to identify other record evidence that corroborated what the officials certified." ECF 23, at 17–18.

As discussed above, the statutory provision governing Labor's obligation to verify information is 19 U.S.C. § 2272(d)(3)(A). It imposes two requirements. Labor must mandate certification of all questionnaire responses. *See* 19 U.S.C. § 2272(d)(3)(A)(i). As to other information "obtained . . . from the firm" on which Labor "relies," the Department must require certification *unless* Labor "has a reasonable basis for

determining that such information is accurate and
complete without being certified." *See    id.*
§ 2272(d)(3)(A)(ii). Significantly, the statute imposes
no personal knowledge requirement on company offi-
cials responding to Labor's inquiries. Insofar as *Tyco
Toys* and *BMC Software* impose an extratextual per-
sonal knowledge requirement, the Court disagrees
with and declines to follow them.

In the Court's view, § 2272(d)(3)(A) is functionally
analogous to Federal Rule of Civil Procedure 30(b)(6),
which likewise imposes no personal knowledge re-
quirement on representatives designated to testify on
behalf of a corporation.[15] As Judge Sutton explains:

> The personal knowledge requirement works dif-
> ferently in this [Rule 30(b)(6)] setting, where a
> human being (Moreno) speaks for a corporation
> (Midland). . . . It is not easy to take a deposition

---

[15] Rule 30(b)(6) provides in relevant part:

> *Notice or Subpoena Directed to an Organization.* In its
> notice or subpoena, a party may name as the deponent
> a public or private corporation, an association, a gov-
> ernmental agency, or other entity and must describe
> with reasonable particularity the matters for examina-
> tion. The named organization must designate one or
> more officers, directors, or managing agents, or desig-
> nate other persons who consent to testify on its behalf;
> and it may set out the matters on which each person
> designated will testify. . . . *The persons designated must
> testify about information known or reasonably availa-
> ble to the organization. . . .*

Fed. R. Civ. P. 30(b)(6) (emphasis added); *see also* USCIT
R. 30(b)(6) (same).

of a corporation or for that matter obtain an af-
fidavit from one. In one sense, indeed, it is not
even possible to do so, as inanimate objects are
not known for their facility with language. That
means, whenever a corporation is involved in lit-
igation, "the information sought must be ob-
tained from natural persons who can speak for
the corporation." 8A Charles Alan Wright et al.,
Federal Practice and Procedure § 2103 (3d ed.
2015). And that means "[t]here is no obligation
to select a person with personal knowledge of the
events in question," so long as the corporation
"proffer[s] a person who can answer regarding
information known or reasonably available *to
the organization.*" *Id.* (emphasis added) (quota-
tion omitted).

*Lloyd v. Midland Funding, LLC*, 639 F. App'x 301, 305
(6th Cir. 2016) (emphasis in original). As in the Rule
30(b)(6) context, a company representative responding
to Labor in a trade adjustment assistance investiga-
tion need not have personal knowledge. It's up to Con-
gress, not the federal judiciary, to impose any such re-
quirement.

Nevertheless, insofar as Labor chooses to rely on
noncertified information from a company representa-
tive, the statute requires that the Department have "a
reasonable basis for determining that such infor-
mation is accurate and complete without being certi-
fied." 19 U.S.C. § 2272(d)(3)(A)(ii). The Court inter-
prets this as requiring Labor—when it relies upon
noncertified information—to expressly find that it has
a reasonable basis for determining the accuracy and

completeness of such information and to explain the basis for that finding.

During its initial investigation, Labor received AT&T's certified questionnaire responses as well as noncertified information from AT&T's in-house counsel. As discussed above in Part I.A.1., the certifying officer's decision did not address what portion(s) of AT&T's evidence she found convincing. The Court is therefore unable to determine whether she relied on the certified questionnaire responses, the noncertified e-mail correspondence with AT&T's in-house counsel, or some combination of both. Nor, to the extent she may have relied on the noncertified information, did her decision address whether she had a reasonable basis for determining that the information was accurate and complete without being certified. The Court must therefore remand so that Labor can address these questions unless Labor's reconsideration determination independently supports Labor's denial of the union's petition.

## B.

As discussed above, all information Labor obtained from AT&T in its reconsideration investigation was noncertified. After that investigation, Labor's negative reconsideration determination consisted of the following two sentences:

> Information obtained during the reconsideration investigation confirmed that the workers' firm neither shifted the supply of call center support services, billing support services, or network

operations center support services (or like or di-
rectly competitive services) to a foreign country
nor contracted to have such services supplied by
a foreign country.

After careful review of previously-submitted in-
formation and additional information obtained
during the reconsideration investigation, the
Department determines that 29 CFR 90.18(c)
has not been met.

AR386.

Labor's reconsideration determination suffered
from the same defects as its initial determination. It
failed to identify AT&T's evidence upon which it re-
lied. It also failed to grapple with the union's evidence
from which conflicting inferences might be fairly
drawn. And insofar as the reconsideration determina-
tion relied on noncertified information obtained from
AT&T, Labor made no finding that it could reasonably
rely on such information. The Court therefore cannot
sustain the reconsideration determination.

## II.

The union also argues that because Labor recently
granted trade adjustment assistance certification to
former AT&T employees in Brecksville, Ohio, *see No-
tice of Determinations Regarding Eligibility to Apply
for Trade Adjustment Assistance*, 84 Fed. Reg. 57,762,
57,765 (Dep't Labor Oct. 28, 2019), and Harrisburg,
Pennsylvania, *see Notice of Determinations Regarding
Eligibility to Apply for Trade Adjustment Assistance*,
83 Fed. Reg. 53,297, 53,300 (Dep't Labor Oct. 22,

2018), Labor was obligated to explain why it reached a different result here.[16] Plaintiffs contend that failure to do so is "unreasoned and unexplained decision-making that results in the disparate treatment of similarly situated parties [and] is arbitrary and therefore unlawful." ECF 23, at 25.

Neither Federal Register publication is even remotely informative as to the basis for Labor's decisions in the prior cases. Both notices referred to the affected former AT&T employees in a table of employee groups collected under the umbrella category of cases in which "[t]he requirements of Section 222(a)(2)(B) (Shift in Production or Services to a Foreign Country Path or Acquisition of Articles or Services from a Foreign Country Path) of the Trade Act [i.e., 19 U.S.C. § 2272(a)(2)(B)] have been met." 83 Fed. Reg. at 53,299–300; 84 Fed. Reg. at 57,764–65. Because Labor does not publish its final decisions or its investigative reports in the Federal Register, that bare-bones language is the extent of the material in the record before this Court regarding the Harrisburg and Brecksville decisions. Therefore, as an initial matter the government is correct in arguing that there is no evidence in the record before the Court demonstrating that Plaintiffs "are similarly situated with workers from

---

[16] There is no indication in the record that the union argued to Labor that its members in the five call centers were similarly situated to its members in the Harrisburg call center, even though Labor's affirmative eligibility decision in that case antedated the union's petition here by just over four months. (Labor issued its affirmative eligibility determination regarding the Brecksville facility after the Department granted reconsideration of the union's petition here.)

different call centers who submitted a different peti-
tion." ECF 24, at 24.[17] That alone is reason to sustain
the agency's determination against the union's "simi-
larly situated" challenge.

Nevertheless, the implication of the union's argu-
ment is that Labor had an affirmative duty to compare
the union's petition here with the facts and circum-
stances of the eligibility determinations in Brecksville
and Harrisburg, notwithstanding that the union's pe-
tition made no claim that its members here were sim-
ilarly situated to the AT&T employees in Brecksville
and Harrisburg and the record lacked any such evi-
dence. But why stop there? If Labor had such an obli-
gation notwithstanding the lack of any evidence, then

---

[17] In its reply, the union argues that its members employed
by AT&T at the Kalamazoo, Appleton, and Indianapolis
call centers "worked in the very same 'Digital, Retail &
Care' division as those former AT&T employees certified"
as eligible for trade adjustment benefits in Labor's Harris-
burg determination. ECF 25, at 17–18. The first problem
with this is that the Harrisburg workers were employed by
the Digital, Retail & Care division of "AT&T Mobility Ser-
vices," *see* 83 Fed. Reg. at 53,300, whereas the Kalamazoo,
Appleton, and Indianapolis call center union workers were
employed by the Digital, Retail & Care division of "AT&T
Teleholdings, Inc." *See* AR 144–45. Moreover, even if the
union members were in fact working for the same entity
and performing identical jobs—facts that are not estab-
lished on this record—that would still not necessarily es-
tablish that the employees in Kalamazoo, Appleton, and In-
dianapolis were similarly situated to the workers in Har-
risburg. It might merely mean that the services in Harris-
burg were offshored, while the services in Kalamazoo, Ap-
pleton, and Indianapolis were not.

presumably it was also obligated to compare the union's petition here with the facts and circumstances of every other Labor eligibility determination as to AT&T employees in recent years (or perhaps recent decades?). The absence of any discernable limiting principle to the union's argument demonstrates that it cannot be right.

The question before Labor was whether AT&T offshored the services at the call centers identified in the union's petition. Labor was required to make that determination based on the evidence in the record in this matter, not on whether Labor had certified other groups of AT&T workers at different locations as to whom there was no evidence in the record. On this record, Labor had no affirmative obligation to compare the union's petition here with previous trade assistance determinations involving other AT&T call centers. *Cf. ABB Inc. v. United States*, 437 F. Supp. 3d 1289, 1301 (CIT 2020) (explaining that different proceedings representing different exercises of agency authority allow for "different conclusions based on different facts in the record").

Court No. 20-00075                                Page 32

### Conclusion

For the reasons provided above, the Court will remand this matter to Labor for further proceedings consistent with this opinion.[18] A separate remand order will issue.

Dated:   May 4, 2021            /s/ *M. Miller Baker*
         New York, NY           M. Miller Baker, Judge

---

[18] On remand, insofar as Labor agrees with the union on the points remanded, Labor must then address whether the offshoring of work "contributed importantly" to the separation of the union's members here. *See* 19 U.S.C. § 2272(a)(2)(B)(ii).